**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| INDOCAN HONEY PRIVATE LIMITED,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | Court No. 26-03292 |

## COMPLAINT

Pursuant to Rule 3(a)(2) of the Rules of the United States Court of International Trade, Plaintiff, Indocan Honey Private Limited ("Indocan" or "Plaintiff") by and through its counsel, alleges and states as follows:

## JURISDICTION

1. Plaintiff brings this action pursuant to, and in accordance with, section 516A(a)(2)(A)(i)(II) of the Tariff Act of 1930, as amended (codified at 19 U.S.C. § 1516a(a)(2)(A)(i)(II), contesting the final results issued by the U.S. Department of Commerce ("Commerce") in Raw Honey from India: Final Results of Antidumping Duty Administrative Review; 2023-2024, 91 Fed. Reg. 36,804 (Dep't Commerce June 18, 2026) ("Final Results"), and accompanying Issues and Decision Memorandum (June 8, 2026) ("IDM"). This Court has jurisdiction over this matter under 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2).

## STANDING

2. Plaintiff, Indocan Honey Private Limited, is a foreign producer and exporter of the merchandise examined in the antidumping duty proceeding and was a mandatory respondent

in the administrative review contested here. Plaintiff therefore is an interested party within the meaning of 19 U.S.C. § 1677(9)(A). As an interested party that actively participated in the underlying administrative proceeding, Plaintiff has standing pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

**TIMELINESS**

3. The Final Results, which is being challenged herein, was published in the Federal Register on June 18, 2026. See 91 Fed. Reg. 36,804. On July 20, 2026, within 30 days after the Final Results were published in the Federal Register, Plaintiff filed a summons to initiate this action. See ECF No. 1. Accordingly, this action was commenced within the period specified in 19 U.S.C. § 1516a(a)(2)(A)(ii). This Complaint is being filed within 30 days of the filing of the summons. Therefore, according to the provisions of 19 U.S.C. § 1516a(a)(2)(A) and Rule 3(a)(2) of the Rules of the U.S. Court of International Trade, this action has been timely brought.

**STANDARD OF REVIEW**

4. This Court reviews final results issued by Commerce pursuant to 19 U.S.C. § 1675 to determine whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

**PROCEDURAL HISTORY**

5. On June 10, 2022, Commerce published an antidumping duty order covering raw honey from India. See Raw Honey from Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders, 87 Fed. Reg. 35,501 (Dep't Commerce June 10, 2022).

6. On July 29, 2024, Commerce initiated the second administrative antidumping review of honey from India covering the period of review ("POR"), i.e., June 1, 2023 through May 31, 2024. See Initiation of Antidumping and Countervailing Duty Administrative Reviews,

89 Fed. Reg. 60,871 (Dep't Commerce July 29, 2024).

7. On September 10, 2024, Commerce released its respondent selection memorandum stating that it had selected Indocan and Shakti Apifoods Pvt. Ltd. as mandatory respondents. See Commerce Memorandum, "2023-2024 Administrative Review of the Antidumping Duty Order on Raw Honey from India: Respondent Selection," (Sept. 10, 2024).

8. Between October 2024 through November 2024, Indocan submitted timely responses to Commerce's initial antidumping duty questionnaire.

9. On November 25, 2024, the petitioners, American Honey Producers Association and Sioux Honey Association, filed an allegation that a Cost-Based Particular Market Situation ("PMS") existed in India due to distorted labor costs. See Letter from Kelley Drye & Warren LLP, "Petitioners' Particular Market Situation Allegation," (Nov. 25, 2024) ("PMS Allegation"). Specifically, the petitioners alleged that Indocan's cost of production ("COP") is distorted due to the Government of India's ("GOI") failure to enforce laws protecting basic workers' rights in the raw honey industry. Id., at 6. The petitioners alleged that "informal" work in India was subject to "little or no enforcement of labor laws," and that this labor sector "has provided approximately 70% of the honey and bee wax market in India." Id., at 7. To support its allegation that the GOI fails to enforce workers' rights in the "informal" sector in India, the petitioners' relied on a 2023 report from the U.S. Department of State, which broadly covered workers' rights in India. Id., at Ex. 1. To support its assertion that the informal sector provides "70 percent" of the labor to the honey industry, the petitioners' relied on an article published in 2022 discussing a study conducted in 2014 of India's honey market. Id., at Ex. 3. Based on their own regression analysis using a calculated labor score and per capita gross national income ("GNI"), the petitioners proposed that Indocan's reported labor costs be adjusted upward by 64.66 percent. Id., at 9.

10. On December 16, 2024, Indocan submitted rebuttal comments and factual information to the petitioners' PMS labor allegation. See Letter from Trade Pacific PLLC, "Indocan's Request to Reject Petitioners' PMS Allegation, and Indocan's Factual Information to Rebut, Clarify, and Correct Petitioners' PMS Allegation," (Dec. 16, 2024). Indocan's rebuttal information established that petitioners failed to provide any connection between the alleged deficiencies in the GOI's enforcement of labor laws and the production of honey in India. Id., at 18–20.

11. On February 21, 2025, Indocan submitted Section D cost of production questionnaire responses on behalf of two beekeeper suppliers. See Letter from Trade Pacific PLLC, "Middleman Supplemental Questionnaire Response (for Middleman 1)," (Feb. 21, 2025); Letter from Trade Pacific PLLC, "Middleman Supplemental Questionnaire Response (for Middleman 2)," (Feb. 21, 2025). Therein, Indocan's suppliers explained that they only purchased raw honey from beekeepers and resold the merchandise as trading companies.

12. On November 18, 2025, Commerce published its preliminary results of administrative review in the Federal Register. Raw Honey from India: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2023-2024, 90 Fed. Reg. 51,645 (Nov. 18, 2025), and accompanying Preliminary Decision Memorandum (Sept. 26, 2025) ("PDM"). Commerce calculated a preliminary weighted-average dumping margin of 0.00 for Indocan. Commerce preliminarily determined that "there is likely a cost-based PMS due to distortions in the Indian labor market." PDM, at 8. Yet, Commerce explained that it intended to solicit information to quantify the distortion and would address the PMS adjustment in a post-preliminary determination. Id.

13. On December 8, 2025, Commerce requested that interested parties submit labor

information for countries with producers of comparable merchandise for the purposes of calculating a labor benchmark under the PMS allegation. See Commerce Letter to All Interested Parties, "Request for Labor Information," (Dec. 8, 2025). In its request, Commerce instructed parties to "calculate a z-score for India's average industrial and agricultural wage rate to ascertain the number of standard deviations by which India's average industrial and agricultural wage rate is below the average industrial and agricultural wage rate of comparable economies with exports of raw honey."

14. On December 15, 2025, Indocan submitted a list of 41 potential surrogate countries for Commerce's consideration in calculating the alleged labor wage distortion. Letter from Trade Pacific PLLC, "PMS Data Request Response," at Worksheet 1 (Dec. 15, 2025). This submission also included the annual U.S. dollar denominated merchandise export data for the honey sector, and the U.S. dollar denominated average hourly earnings for the relevant sectors for each country. Id., at Worksheet 2 and 3.

15. On April 1, 2026, nearly 18 months after the petitioners filed their allegation, Commerce issued its post-preliminary determination addressing petitioners' PMS labor allegation. See Commerce Memorandum, "Post-Preliminary Analysis in the 2023-2024 Administrative Review of the Antidumping Duty Order on Raw Honey from India," (Apr. 1, 2026) ("Post-Prelim PMS Memo"). Commerce found that a PMS exists in India which distorts the COP of raw honey due to the GOI's inadequate labor protections. Id., at 6. In doing so, Commerce generally relied on the U.S. Department of State report submitted by the petitioners, which provided an overview of workers' rights in India. Id.; see also PMS Allegation, at Ex. 1. Commerce further determined that lack of labor enforcement has impacted the production of raw honey as "the informal sector has provided approximately 70% of the honey and bee wax market

in India." Post-Prelim PMS Memo, at 6. Commerce determined that it was "more likely than not" that the GOI's inadequate labor protections distorted the COP because "82 percent of raw honey exporting countries which are economically comparable to India have higher agricultural wage rates than that of India." Id., at 7. In calculating a PMS adjustment, Commerce selected agricultural wage data from Cambodia, determining that it was economically comparable to India. Id. Commerce calculated the difference between the Indian agricultural labor wage rates and the agricultural wage rate in Cambodia Id., at Attachment 2. It then applied this difference as an upward adjustment to Indocan's middleman and beekeeper's COP. Id. Commerce adjusted both middleman and beekeeper supplier chains using a simple average of their adjusted labor costs over their quantity supplied. Id. As a result of this PMS adjustment, Commerce calculated a revised weighted-average dumping margin of 11.49 percent for Indocan. Id., at 9.

16. On April 14, 2026, Indocan submitted its affirmative case brief in response to issues raised in Commerce's post-preliminary determination. Brief from Trade Pacific PLLC, "Case Brief," (Apr. 14, 2026). Therein, Indocan argued that Commerce's PMS finding is procedurally deficient because it failed to accept, reject, or even formally initiate the petitioners' PMS allegation pursuant to 19 C.F.R. § 351.301(c)(2)(v), which requires Commerce to issue a memorandum accepting or rejecting allegations. Id., at 5–6. In addition, Indocan argued that Commerce's PMS finding fails to include any link between the GOI's alleged inadequate labor protections and the honey sector. Id., 9–14. Indocan explained that Commerce's PMS determination that the GOI fails to adequately enforce worker protections in the "informal" sector rests on a single U.S. Department of State report using data from 2021-2022 (prior to the POR) and makes no reference to the honey industry specifically. Id., at 9. Indocan also explained that Commerce relied on a single excerpt from petitioners' allegation that "the

informal sector has provided approximately 70 percent of the honey and bee wax market in India" to support its determination that inadequate labor protections must have distorted the honey sector. Id., at 11–12. However, Indocan explained that this statement is sourced from an article published in 2022 based on an outdated study conducted in 2014. Id.; see also PMS Allegation, at Ex. 3. Finally, Indocan argued that Commerce erred in relying on Cambodia as a surrogate country for the labor PMS benchmark rather than Kenya, and that Commerce should not make an adjustment to the middleman's labor costs because such suppliers are only traders of raw honey, and not producers. Id., at 17–23.

17. On June 18, 2026, Commerce published its final results of administrative review in the Federal Register. Final Results, 91 Fed. Reg. 36, 804. Commerce made no changes to its affirmative finding that a PMS exists in India, and it continued to find that the GOI fails to adequately enforce worker protections within the "informal" sector. IDM, at Cmt. 7. In response to Indocan's argument that Commerce relied on an outdated report from 2014 that "70 percent of India's honey comes from the informal sector," Commerce explained that it had "no more recent data on the record to show that the number has changed." Id. Thus, Commerce continued to find that the "informal" sector encompasses beekeepers and honey workers. Id. In addition, Commerce defended its decision to apply an upward adjustment to the Indocan's middleman's labor costs, finding that "all costs from harvesting of the honey through to the respondents own portion of the production cycle are part of the cost of producing the raw honey being examined in this review." Id., at Cmt. 10. Finally, Commerce declined to rely on a different surrogate country for calculating the alleged labor wage distortion in India, and continued to use Cambodia, concluding that it served as the best surrogate country on the record. Id., at Cmt. 9. In doing so, Commerce declined to rely on wage information from Kenya, finding

that "it would be impermissible to adjust a suppressed wage by an even lower wage." Id., at Cmt. 8.

18. In its Final Results, in response to Indocan's argument, Commerce explained that formal initiation of the petitioners' PMS allegation was not necessary because interested parties had meaningful opportunities to submit rebuttal factual information. See IDM, at Cmt. 6. Accordingly, Commerce determined that it followed appropriate procedures by not accepting, rejecting, or formally initiating an inquiry into the petitioners' PMS allegations. Id.

19. Commerce made one adjustment in the Final Results to its PMS labor cost methodology. Because Commerce determined that the "informal sector provides 70 percent of the honey in India," Commerce prorated its PMS labor cost adjustment to reflect that only 70 percent of the labor was distorted. IDM, at Cmt. 10. Consequently, as a result of Commerce's PMS labor cost adjustment, the final weighted-average dumping margin and ongoing cash deposit rate for Indocan was set at 6.98 percent. Final Results, at 36,805.

## ISSUES PRESENTED BY THE ACTION AND PLAINTIFF'S STATEMENT OF CLAIMS

20. In the following respects, and for other reasons apparent from the record of the administrative proceeding, Commerce's final results in its antidumping duty administrative review is unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT ONE

21. Paragraphs one through twenty are incorporated herein by reference.

22. Commerce's failure to formally accept or reject the petitioner's PMS allegation as required by 19 C.F.R. § 351.301(c)(v)(2) was not in accordance with the law. Commerce's regulation requires that it accept or reject all allegations: "{u}pon receipt of factual information under this subsection, the Secretary will issue a memorandum accepting or rejecting the

information." See 19 C.F.R. § 351.301(c)(v)(2). Commerce did not formally accept or reject the petitioners' PMS allegation as required by the regulation. Instead, Commerce merely referenced the petitioners' PMS allegation in its preliminary results and issued a post-preliminary decision accepting the allegation and applying a PMS adjustment. See PDM, at 8; Post-Prelim PMS Memo. Commerce's assertion that its own failure to officially accept or initiate petitioners' PMS allegation made "no material difference" does not permit it to ignore its own regulations. IDM, at Cmt. 6. As such, Commerce's PMS determination was procedurally invalid and not in accordance with law.

**COUNT TWO**

23. Paragraphs one through twenty-two are incorporated herein by reference.

24. Commerce's finding of a cost-based PMS affecting labor in the honey sector was unsupported by substantial evidence. The circumstances supporting a PMS finding must be particular to the producers of the subject merchandise during the relevant period. Here, Commerce's conclusion relies on several unsubstantiated assumptions. One, Commerce relied on a single report from the U.S. Department of State to support its conclusion that "informal" worker protections in India are inadequate. Post-Prelim PMS Memo, at 6. From there, Commerce connected this finding to the honey industry specifically by relying on an outdated study from a 2014 that informal workers provide "70 percent" of the labor for the honey industry. Id. The record does not contain any evidence connecting the alleged lack of adequate worker protections to the honey industry in particular. Any determination that is based on speculation or leaps in logical inferences cannot be supported by substantial evidence. Accordingly, Commerce's cost-based PMS labor adjustment to the COP of Indocan's honey suppliers was unsupported by the record and not in accordance with the law.

## COUNT THREE

25. Paragraphs one through twenty-four are incorporated herein by reference.

26. Commerce's employed z-score methodology for determining that a labor distortion existed in India was unsupported by substantial evidence. Commerce's PMS finding relied on a z-score methodology using a pool of comparable raw honey exporting countries, from which it concluded that India's agricultural wage rate in a statistical outlier, finding that 82 percent of comparable countries reported agricultural wage rates higher than India's. IDM, at Cmt. 8. However, this analysis failed to establish the requisite nexus required to uphold a PMS finding. Commerce's comparison was limited to aggregate agricultural wage rates across broadly defined economies, encompassing a wide array of industries unrelated to honey production. Commerce failed to rely on any record evidence demonstrating that wage levels specific to Indian beekeepers are distorted relative to those in comparable exporting countries. In the Final Results, Commerce's assertion that "no reliable, international, beekeeper-specific wage rates exist on the record for India and the potential surrogate countries," does not give it permission to make speculative conclusions based on inaccurate data methodology. Id. Accordingly, Commerce's reliance on the z-score analysis failed to demonstrate that Indian beekeepers' wages were suppressed, and Commerce's PMS finding is therefore unsupported by substantial evidence.

## COUNT FOUR

27. Paragraphs one through twenty-six are incorporated herein by reference.

28. Commerce's selection of Cambodia as a surrogate country for calculating the alleged labor distortion in India was unsupported by substantial evidence. Using its z-score methodology, Commerce narrowed the pool of comparable countries and selected Cambodia as

the benchmark country for calculating the PMS labor distortion because its GDP per capita and honey export volume was the closest to India among the remaining candidates. Id. Commerce's analysis resulted in five countries that were below India's GDP and five above. Id., at Cmt. 7. Yet, Commerce only considered comparable economies that resulted in an upward labor cost adjustment, and declined to consider any other economies, i.e., Kenya, which would produce a downward adjustment to Indocan's reported costs. Id., at Cmt. 9. Commerce's rationale that it would be "impermissible to adjust a suppressed wage by an even lower wage," stems from its z-score analysis which, as demonstrated in Count Three above, is unspecific to the honey labor market. Id., at Cmt. 8. As such, Commerce discarded a comparable economy not because it was unreliable, but because it undermined Commerce's preferred conclusion that a labor distortion exists. Commerce's determination to select Cambodia as a benchmark country is therefore unsupported by substantial evidence and not in accordance with the law.

**COUNT FIVE**

29. Paragraphs one through twenty-eight are incorporated herein by reference.

30. Even if Commerce's determination of that a cost-based labor PMS exists in India is sustained, Commerce's application of the PMS adjustment to Indocan's middleman suppliers was unsupported by substantial evidence. The record establishes that middleman suppliers are not producers of raw honey and do not perform any labor associated with the manufacture or production of subject merchandise. As such, all direct labor reported by Indocan's middleman suppliers reflect labor for trading and distribution only. Commerce's explanation that it must apply the labor PMS to the "entire supply chain" of the subject merchandise ignores detracting record evidence that middleman distributors and traders are not a part of the "informal" sector that Commerce's adjustment aims to target. Because Commerce's labor-based PMS

determination is premised on its finding that beekeepers operate within the informal sector, Commerce's labor adjustment to middleman suppliers is unsupported by substantial evidence and is not in accordance with the law.

**DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF**

31. For the reasons stated above, Plaintiff respectfully requests that the Court:

(a) enter judgment in Plaintiff's favor;

(b) declare that with respect to the issues raised in this Complaint, Commerce's final results and all related findings and conclusions are unsupported by substantial evidence on the record or are otherwise not in accordance with law;

(c) remand these matters to Commerce for redetermination consistent with the Court's opinion; and

(d) provide such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Aqmar Rahman
Aqmar Rahman
Jonathan M. Freed

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC 20003
Tel: (202) 223-3760
arahman@tradepacificlaw.com

*Counsel for Plaintiff Indocan Honey Private Limited*

Dated: August 18, 2026